NOT DESIGNATED FOR PUBLICATION

No. 118,752

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LAW COMPANY BUILDING ASSOCIATES,
a Kansas Limited Partnership,

and

THE LAW COMPANY, INC.,
*Appellees*,

v.

MARGARET RUSSELL LAW,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed July 12, 2019. Affirmed in part, reversed in part, and remanded with directions.

*F. James Robinson, Jr.* and *Scott M. Hill*, of Hite, Fanning & Honeyman, LLP, of Wichita, for appellant.

*Roarke R. Gordon*, *Ron L. Campbell*, and *Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellees.

Before POWELL, P.J., LEBEN, J., and KEVIN BERENS, District Judge, assigned.

POWELL, J.: This appeal arises from a declaratory judgment action by Law Company Building Associates (LCBA) and The Law Company, Inc. (collectively referred to as the Plaintiffs), asking the district court to find that they properly calculated Margaret Russell Law's equity participation share of a real estate sale under a financing

agreement entered into between them. Following the parties' cross-motions for summary judgment, the district court granted the Plaintiffs summary judgment, concluding that Margaret's 11% equity participation share from the $5,600,000 sale of real estate amounted to $242,039 under the terms of the financing agreement. Margaret disagrees, claiming: (1) Under the terms of the financing agreement improper offset amounts were applied to the sale price before calculating her equity participation share, (2) the Plaintiffs breached the financing agreement, and (3) she is entitled to an additional $294,588.52 with attorney fees and late charges for the Plaintiffs' untimely payment of her equity participation share.

For the reasons more fully explained below, we agree with Margaret that certain offsets should not have been applied to the sale price of the real estate before calculating her equity participation share. We also hold that the financing agreement is ambiguous as to the limitations placed on capital expenditures that may be offset from the sale price. Given that ambiguity, we cannot determine whether the Plaintiffs' other claims for capital expenditure offsets are valid without parol evidence, thus creating issues of material fact precluding summary judgment. Finally, we hold that although Margaret is entitled to additional amounts for her equity participation share from the sale of the real estate, the district court did not err in finding she is not entitled to attorney fees and late charges as part of her costs of collection.

Accordingly, while we affirm the district court's denial of Margaret's claims for attorney fees and late charges, we reverse the district court's grant of summary judgment to the Plaintiffs and remand for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from the Plaintiffs' declaratory judgment action asking the district court to find that Plaintiffs properly calculated Margaret's equity participation

2

share under a financing agreement entered into between them. Following the parties' cross-motions for summary judgment, the district court granted the Plaintiffs summary judgment, concluding that Margaret's 11% equity participation share from the $5,600,000 sale of the Riverview Building amounted to $242,039. Margaret disagrees and this appeal followed. The following facts are relevant to this appeal.

*A Summary of Margaret's Equity Participation*

Margaret and her late former husband founded The Law Company. After the dissolution of her marriage in 1979, Margaret received stock in The Law Company that she later exchanged for ownership of the Market Street Building, an office building in Wichita, Kansas, that The Law Company occupied. Margaret and The Law Company entered into a lease agreement, which expired on December 31, 2004, giving Margaret the authority to sell or lease the building to a third party at the end of the term.

In 1980, The Law Company desired more office space and sought to build the Riverview Building in Wichita with the use of industrial revenue bonds (IRBs) issued by the City of Wichita. The Law Company formed LCBA, a Kansas limited partnership, for the purpose of holding title to the Riverview Building. City of Wichita Ordinance No. 37-813 dated March 1, 1982, issued IRBs in a principal amount of $4,200,000. Due to the IRB requirements, the City assumed ownership of the Riverview Building and leased it to LCBA under the IRB Lease dated March 1, 1982. The IRB Lease term was for "'twenty (20) years, commencing as of the date of this Lease and ending on March 1, 2002, or until the principal of the IRB and all interest thereon shall have been paid or provisions made for the payment thereof.'" As the principal tenant, LCBA agreed to guarantee the IRB payments and to fund any cost overruns. The Law Company, which would occupy the building, was the master subtenant and also agreed to guarantee the IRB payments.

3

On January 12, 1984, Margaret and the Plaintiffs entered into a financing agreement in which Margaret agreed to sell her interest in the Market Street Building to LCBA, so LCBA could resell the building, if needed, to help finance the Riverview Building's construction. Margaret also agreed to cancel the Market Street lease with The Law Company when ownership transferred to LCBA. In exchange, LCBA granted Margaret equity participation rights in the Riverview Building that mainly consisted of an 11% share in the proceeds of any future sale or refinancing of the building.

According to the financing agreement, LCBA also agreed to execute a promissory note in the amount of $406,836, secured by a mortgage, which required LCBA to make monthly payments to Margaret. Margaret's equity participation in the Riverview Building was reflected in the promissory note, the security agreement, and the mortgage. The financing agreement detailed how to calculate the amount of Margaret's 11% equity participation share in the event of a sale or refinance of the Riverview Building (referred to as the IRB Project) under Paragraph 4(a):

"4. Equity Participation Rights:

(a) Assets Subject to Participation. The holder of the Equity Participation (the 'Equity Participant') shall be entitled to 11% of a sum (hereinafter referred to as the 'Sale Balance' or 'Refinancing Balance' as the context requires) equal to the gross proceeds of a Sale or Refinancing (as defined in Paragraph 5 hereof) of the IRB Project net of the following items:

(i) all direct costs of such Sale or Refinancing;

(ii) any amounts paid to discharge the principal of the IRB if same is to be discharged in connection with such Sale or Refinancing;

(iii) any amounts paid to discharge the principal of the Loan if same is to be discharged in connection with such Sale or Refinancing;

4

(iv) any amounts paid to discharge the principal of any other loan which may be made for Capital Expenditures (as hereinafter defined) made in connection with the IRB Project or acquisition thereof by LCBA or any of its Affiliates, excluding any loan made for operating expenses and any loan described by clause (v) below; and

(v) the principal amount of capital contributed or loaned to LCBA by [The Law Company] or any of its Affiliates for Capital Expenditures made in connection with the IRB Project or acquisition thereof by LCBA or any of its Affiliates, returned without interest, but excluding any equity invested or loans made for operating expenses."

Paragraph 5(b) of the financing agreement defined capital expenditure as

"any 'Construction Cost,' as that term is defined by Section 4.7 of the IRB Lease, which is paid by LCBA or by any of its Affiliates, exclusive of builder's overhead or profit if payable to [The Law Company] or to any of its Affiliates, and exclusive of tenant improvements which are not financed by the IRB. Further, in no event shall any legal expenses incurred by LCBA or any of its Affiliates on its behalf in connection with preparation or performance of this Agreement be deemed a Capital Expenditure."

Section 4.7 of the IRB Lease, which governed LCBA's (Tenant) leasing of the Riverview Building (Project) from the City (Landlord), defined construction cost:

"The term 'Construction Cost' shall be construed to include all of the following costs and expenses paid or incurred subsequent to August 12, 1980: (i) all costs and expenses necessary or incident to the acquisition of the Land and such of the Improvements as are constructed, installed or in progress at the date of such acquisition; (ii) all costs and expenses of every nature incurred in constructing, purchasing and/or installing the Improvements and completing the Project, including the machinery and equipment constituting a part of same and referred to in Section 4.5 hereof, including interest paid or to be paid by Tenant during construction; (iii) any and all expenses incurred by Landlord or Tenant, including those prior to the sale of the Bond, for planning, development and

5

design, and all expenses for architects' and engineering fees; the fees and expenses of Tenant's employees and consultants, surveys, attorneys' fees, and other items necessary to the commencement of construction, including advances to contractors and others by Tenant; (iv) all other expenses necessary or incident to the construction and completion of the Project; and (v) any and all expenses of whatever nature incurred in connection with the issuance and sale of the Bond, including but not limited to underwriting expenses incurred subsequent to August 12, 1980 and which qualify as expenditures paid or incurred in accordance with Section 103(b) of the Code and Treasury Regulations promulgated pursuant thereto. Landlord hereby agrees to pay for, but solely from the Construction Fund, and hereby authorizes and directs the Fiscal Agent to pay for, but solely from the Construction Fund all Construction Costs, upon receipt by the Fiscal Agent of a certificate of the Project Manager, requesting a specified sum of money, and describing in reasonable detail the Construction Costs which forms the basis for said request, as provided by Sections 4.4 and 4.5 hereof.

"Within three (3) months following the end of the Tenant's fiscal year in which construction of the Project is completed, Tenant shall file a verified statement of its final cost, certified by Fox & Company, independent Certified Public Accountants, with appropriate detail showing the cost of elements of construction, which statement may be part of Tenant's annual financial statement for such year. The Tenant shall make available to the Fiscal Agent and Landlord upon request, its receipted invoices for labor and material covering all Improvements; any furniture, fixtures and equipment which become part of the Improvements; and architects' and engineers' fees, and any other Construction Costs hereunder. The Fiscal Agent may rely fully on any such direction and shall not be required to make any investigation in connection therewith, except that the Fiscal Agent shall investigate requests for reimbursement directly to Tenant and shall require such supporting evidence as would be required by a reasonable and prudent trustee."

*Prior Appellate Disputes*

The parties have previously litigated disputes which have required resolution by our court. The first concerned LCBA's offer in 1986 to prepay the promissory note in exchange for Margaret's release of the mortgage on the Riverview Building; the second

6

concerned a dispute over Margaret's equity participation rights in the Riverview Building. See *Law v. Law Company Building Associates*, No. 111,140, 2015 WL 2131608, at *1-3 (Kan. App. 2015) (unpublished opinion) (detailing parties' previous appeals), *rev. denied* 303 Kan. 1078 (2016). In the most recent appeal, Margaret argued in part that the Plaintiffs were required to pay her equity participation share on December 31, 2004—the date LCBA's limited partnership term was originally set to expire—under Paragraphs 4(a) and 4(e) of the financing agreement. On that same date, LCBA paid off the promissory note for the Market Street Building. A panel of this court affirmed the district court's summary judgment for the Plaintiffs, holding the financing agreement provided that Margaret's equity participation would be discharged upon

> "(1) a sale or refinancing of the Riverview Building or (2) the termination of LCBA. The agreement further allowed for the possibility of LCBA's partnership term to be extended beyond December 31, 2004. Because none of the circumstances warranting discharge of Law's equity participation have yet occurred, the district court properly granted summary judgment in favor of the defendants on Law's breach of contract claim." 2015 WL 2131608, at *7-8.

After the panel issued the above decision, the Riverview Building sold for $5,600,000 on July 29, 2015.

*The Dispute over the Amount of Margaret's Equity Participation Share*

After the sale of the Riverview Building, the Plaintiffs tendered a check to Margaret for $242,039. Given the dispute over the proper amount, Margaret refused to accept the check and her counsel returned it to the Plaintiffs. The Plaintiffs then sent a second check for the same amount which Margaret accepted upon receiving a stipulation reserving her rights and claims to her equity participation share.

In June 2016, the Plaintiffs filed the present declaratory judgment action in the district court seeking a ruling that Margaret's equity participation share—with the offsets applied under Paragraph 4(a)—amounted to $242,039. Margaret answered and counterclaimed for breach of contract, arguing she was entitled to a higher equity participation share and for late fees under Paragraph 4(f) of the financing agreement which states: "If any sum is payable on account of the Equity Participation and is not timely paid, then the costs of collection and interest (at the rate of 1.5% per month or partial month) shall be added to the overdue sum."

Subsequently, the parties filed cross-motions for summary judgment. According to the record, the parties agreed the Plaintiffs were entitled to a $295,612 offset for the direct sale costs of the Riverview Building pursuant to Paragraph 4(a)(i) of the financing agreement. But the parties disputed the amount of offsets the Plaintiffs were entitled to apply under Paragraph 4(a)(v) of the financing agreement. Paragraph 4(a)(v) allowed the Plaintiffs to offset any principal amount of capital contributed or loaned by the Plaintiffs for capital expenditures made in connection with the IRB Project or acquisition thereof. Capital expenditures was defined as construction costs, with some exclusions, as defined in Section 4.7 of the IRB Lease. The Plaintiffs argued they had properly calculated Margaret's 11% equity participation share and presented an affidavit from The Law Company's Chief Financial Officer Marc A. Porter. In relevant part, Porter's affidavit stated:

"15.    The total cost of constructing the Riverview Building was $6,101,853.

"16.    The cost of constructing the Riverview Building was financed in part by means of Industrial Revenue Bonds (IRBs) issued by the City of Wichita, which totaled $4,200,000.

"17.    The remaining $1,901,853 necessary to complete the construction of the Riverview Building was advanced by The Law Company, as LCBA's general partner.

8

"18.    Pursuant to the IRB Lease, the City of Wichita owned the Riverview Building, and LCBA could not acquire title to the building, until the IRBs were paid off.

"19.    At the time of the sale of the Riverview Building, the outstanding balance of the loans made by The Law Company to LCBA for 'Capital Expenditures' was $3,104,032. The Capital Expenditure loan was composed of the following:

| | |
|---|---:|
| Funds deposited into IRB accounts | $1,025,000 |
| Telephone system capital lease | 325,970 |
| Other Capital Expenditures | 144,047 |
| IRB principal payments | 4,200,000 |
| Margaret Law note principal payment | 406,836 |
| Original loan Amount | 6,101,853 |
| Less Payments on loan | (2,997,821) |
| **Capital expenditure loan balance** | **$3,104,032** |

"20.    As reflected in this itemization, The Law Company advanced funds to pay off Mrs. Law's promissory note, which also financed Capital Expenditures.

"21.    Incorporating the offsets for (i) the direct costs associated with the sale of the Riverview Building, and (ii) the loan balance for Capital Expenditures made by The Law Company to LCBA, the correct calculation of Mrs. Law's Equity Participation is as follows:

| | |
|---|---:|
| Sale price | $5,600,000 |
| Less direct costs of sale (per Paragraph 4(a)(i)): | (295,612) |
| Net sale proceeds | 5,304,388 |
| Less Capital Expenditures loans balance | |
| (per Paragraph 4(a)(v)) | (3,104,032) |
| Equity | 2,200,356 |
| Mrs. Law's 11% Equity Participation rate | x      .11 |
| **Mrs. Law's Equity Participation amount** | **$242,039**" |

In response, Margaret controverted the facts in Porter's affidavit. The Plaintiffs' reply to Margaret's response advanced three legal arguments, added no additional factual evidence, and continued to rely on its affidavits.

Relying on the opinion of her expert witness—Nolan Luke, C.P.A.—which was based on a review of the Plaintiffs' documents, Margaret argued in her motion for summary judgment that the Plaintiffs' calculations were incorrect and that the Plaintiffs were only entitled to an offset under Paragraph 4(a)(v) for $25,956 in Capital Expenditures or Construction Costs. Margaret initially argued she was entitled to an additional $338,588.52, plus late charges. After the Plaintiffs' response, Margaret admitted that the Plaintiffs were entitled to a $400,000 offset for The Law Company's deposit into the Construction Fund. But Margaret maintained the Plaintiffs were only entitled to a $25,956 offset under Paragraph 4(a)(v) and argued she was therefore owed an additional $294,588.52, plus late charges.

During the proceedings, each party argued the district court could resolve the legal questions based upon the undisputed facts when interpreting the parties' financing agreement in order to determine Margaret's equity participation. At a hearing, the district court suggested the parties submit proposed findings of facts and conclusions of law. Margaret's counsel stated, "I am not sure how to write the findings of fact until we know how you are interpreting the agreement. That's what is controlling, because we may be giving facts that have no bearing on the agreement as interpreted." The Plaintiffs' counsel suggested the district court decide the issues based on proposed conclusions of law only and then decide how its interpretation of the agreement applied to the facts. The district court ordered the parties to submit proposed conclusions of law.

After each party's submission, the district court adopted the Plaintiffs' proposed conclusions of law in full and granted summary judgment for the Plaintiffs. The parties' e-mails with the district court after its decision are included in the record on appeal and show that Margaret's counsel suggested the district court's order lacked final judgment language and it should order the Plaintiffs' counsel to file a Rule 170 proposed journal entry with the necessary language under K.S.A. 2017 Supp. 60-258. See Supreme Court Rule 170 (2019 Kan. S. Ct. R. 222). Later that day, the Plaintiffs' counsel submitted a

10

proposed journal entry and wrote: "[W]e simply included each party's facts (which were uncontroverted by the opposing party) within a separate section (Section II)." Margaret objected to the proposed journal entry under Rule 170 and moved for reconsideration, arguing the proposed journal entry had inadequate findings of fact and erroneously interpreted the meaning of Capital Expenditures under Paragraph 4(a) of the financing agreement.

At the later hearing, the Plaintiffs argued that the district court should adopt a revised journal entry that included additional facts supporting its calculation of Margaret's equity participation share. In response, Margaret argued she had controverted those facts, meaning that the district court could not rely on them to enter summary judgment for the Plaintiffs. The Plaintiffs argued that because both parties had agreed there were no issues of material fact in dispute, the district court should find that Margaret could not now argue that disputed material facts precluded summary judgment. The district court agreed with the Plaintiffs and held that Margaret had waived any objection to the Plaintiffs' findings of fact as disputed or inadequate. The district court further denied Margaret's motion for reconsideration, holding she raised or could have raised the arguments before the summary judgment order.

The district court adopted the revised journal entry and entered summary judgment for Plaintiffs. Summarized, the district court found the following facts uncontroverted regarding the Riverview Building's construction:

(1)     Financing the construction of the building required three accounts: the Bond Reserve Account, the Principal and Interest Account, and the Construction Fund Account.

11

(2)     Under Section 3.1 of the IRB Lease:

> "The proceeds of the sale of the Bond shall be paid over to the Fiscal Agent for the account of Landlord. The Fiscal Agent shall, next, promptly pay from the proceeds of said sale of the Bond into the Principal and Interest Account the full amount of any accrued interest and premium, if any, received upon such sale. The Fiscal Agent shall next deposit the sum of $400,000 to the credit of the Bond Reserve Account. The remainder of such proceeds shall be deposited by the Fiscal Agent in a trust account designated 'City of Wichita, Kansas, Law Company Building Associates Construction Fund' (the 'Construction Fund'), to be used and applied as provided in Article IV and as otherwise provided in the Bond Ordinance, except that underwriting costs may be paid from the Construction Fund without further order or authorization."

(3)     In addition to the $400,000 deposit from the IRB proceeds, the IRB Lease required LCBA to make two yearly $25,000 deposits into the Bond Reserve Account until the balance reached $630,000.

(4)     LCBA also agreed to pay "Basic Rent" in semi-annual installments under the IRB Lease. The IRB Lease stated LCBA must

> "pay rent under this Lease in amounts necessary to pay (i) the principal of, and interest on, the [IRB] and (ii) all Additional Rent payable under Section 2.4 hereof, and such rent installments will be used to pay such principal, interest and amounts within thirteen (13) months of the time of the payment thereof by the Tenant."

(5)     Construction began in 1982.

(6)     From January 1 to September 20, 1983, the project's revenues, expenses, and the IRB balance consisted of:

12

| | | |
|---|---|---|
| Rent paid by Law Company | | |
| February 1983 | $122,688 | |
| August 1983 | $244,064 | |
| Interest Income | $188,193 | |
| Bond reserve contribution by Law Company | $25,000 | |
| Total receipts (1-1-83/9-20-83) | $579,945 | $579,945 |

Payments (1-1-83/9-20-83)

| | | |
|---|---|---|
| Interest paid | $609,000 | |
| Construction draw 1-31-83 | $303,745 | |
| Construction draw 3-2-83 | $433,787 | |
| Construction draw 3-30-83 | $537,911 | |
| Construction draw 4-27-83 | $481,478 | |
| Construction draw 5-27-83 | $369,619 | |
| Construction draw 6-28-83 | $226,191 | |
| Construction draw 7-28-83 | $213,099 | |
| Construction draw 8-29-83 | $235,191 | |
| Total Payments (1-1-83/9-20-83) | $3,410,021 | ($3,410,021) |
| Balance of Bond funds at September 20, 1983 | $464,072 | $464,072 |

| | |
|---|---|
| Bond funds at 9-20-83 consisted of: | |
| Bond reserve fund | $425,000 |
| Principal and interest fund | $3,439 |
| Construction fund | $35,633 |
| | $464,072 |

(7) A September 27, 1983 draw exhausted the IRB proceeds in the Construction Fund. The Law Company loaned LCBA $600,000, with the funds deposited into a separate account called the Special Construction Fund.

(8) The project's revenues, expenses, and IRB balance after September 20, 1983, consisted of:

Receipts (after 9-20-83)

| | | |
|---|---|---|
| Contribution from Law Company into a Special Construction Fund | $600,000 | |
| Interest income: | | |
| Construction funds | $2,828 | |
| Principal and interest fund | $838 | |
| Total receipts (after 9-20-83) | $603,666 | $603,666 |

Payments (after 9-20-83)

| | | |
|---|---|---|
| Construction draw 9-27-83 | $283,775 | |
| Construction draw 10-25-83 | $277,561 | |
| Construction draw 11-29-83 | $67,277 | |
| Total payments (after 9-20-83) | $628,613 | ($628,613) |
| Balance of Bond funds at December 31, 1983 | $439,125 | $439,125 |

| | |
|---|---|
| Bond funds at 12-31-83 consisted of: | |
| Bond reserve fund | $425,000 |
| Principal and interest fund | $4,277 |
| Special Construction Fund | $9,848 |
| | $439,125 |

(9)     The Law Company's directors meeting report from August 8, 1983, stated "'construction work is 99% complete, except for tenant finishes.'" The October 3, 1983 report stated "'construction work is complete, except for tenant finishes'" and the "construction work in [The Law Company] and [Law Kingdon] spaces will be completed this month, with move-in scheduled prior to November 1.'" The December 5, 1983 report stated "'construction work is complete, except for tenant finishes,'" and "construction work in [The Law Company] and [Law Kingdon] spaces has been completed, with both tenants now in operation in their facilities.'"

(10)     By December 17, 1983, the building was 93% occupied.

The district court's summary judgment order also contained the following "Additional Findings of Fact."

"In their summary judgment briefing, both parties contend there are no material facts in dispute which should prevent this Court from entering a summary judgment order. Both parties acknowledge the interpretation of the parties' written documents is a legal question for this Court, which determination will then guide the relevant facts. Given the ultimate Conclusions of Law set forth below, which were adopted by this Court on September 5, 2017, the Court makes the following additional findings of fact:

14

"53.     The total cost of constructing the Riverview Building was $6,101,853. (Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment, citing Porter Affidavit, ¶ 15).

"54.     The cost of constructing the Riverview Building was financed in part by means of Industrial Revenue Bonds (IRBs) issued by the City of Wichita, which totaled $4,200,000. (Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment, citing Porter Affidavit, ¶ 16).

"55.     The remaining $1,901,853 necessary to complete the construction of the Riverview Building was advanced by The Law Company, as LCBA's general partner. (Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment, citing Porter Affidavit, ¶ 18).

"56.     Pursuant to the IRB Lease, the City of Wichita owned the Riverview Building, and LCBA could not acquire title to the building, until the IRBs were paid off. (Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment, citing Porter Affidavit, ¶ 19).

"57.     At the time of the sale of the Riverview Building, the outstanding balance of the loans made by The Law Company to LCBA for 'Capital Expenditures' was $3,104,032.

| | |
|---|---|
| Original loan amount | $6,101,853 |
| Less payments on loan | (2,997,821) |
| **Capital Expenditures loan balance at time of sale** | **$3,104,032** |

(Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment, citing Porter Affidavit, ¶ 20).

"58.     As indicated by the itemization in paragraph 32, The Law Company advanced funds to pay off Mrs. Law's promissory note, which also financed Capital Expenditures. (Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment, citing Porter Affidavit, ¶ 21)."

The district court ultimately concluded that the Plaintiffs had properly calculated Margaret's 11% equity participation share as $242,039. It also held that even if Margaret had been successful in her claim, she was not entitled to prejudgment interest under Paragraph 4(f) because her claim was unliquidated.

Margaret timely appeals.

<u>ANALYSIS</u>

I.      DID THE DISTRICT COURT ERR IN GRANTING SUMMARY JUDGMENT FOR PLAINTIFFS IN ITS DETERMINATION OF THE APPLICABLE OFFSETS UNDER PARAGRAPH 4(a)(v) OF THE FINANCING AGREEMENT?

As outlined above, the financing agreement gave Margaret an equity participation share of 11% from the proceeds of the sale or refinance of the Riverview Building. The Riverview Building was sold for $5.6 million. However, the financing agreement also contained a number of offsets to the sale amount, which were subtracted from the sale price before calculating Margaret's equity participation share. The parties' main dispute is over the proper offsets. Because the district court granted the Plaintiffs summary judgment, we begin with our standard of review.

A.      *Standard of Review*

"'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude

16

summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 622, 345 P.3d 281 (2015).

"The mere filing of cross-motions for summary judgment does not obligate a trial court to enter summary judgment. Rather, the trial court must independently determine whether a genuine issue of material fact exists." *Wheeler v. Rolling Door Co.*, 33 Kan. App. 2d 787, 791, 109 P.3d 1255 (2005); see *Henrickson v. Drotts*, 219 Kan. 435, 438, 548 P.2d 465 (1976). "If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact." *Bergstrom v. Noah*, 266 Kan. 847, 872, 974 P.2d 531 (1999). "To the extent 'material facts are uncontroverted, an appellate court reviews summary judgment de novo.'" *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018).

B.      *Offset Provision in the Financing Agreement*

The main contest on appeal is the parties' intended meaning for the offsets under Paragraph 4(a) of the financing agreement. Accordingly, our interpretation of that agreement is central in resolving the parties' dispute.

The interpretation and legal effect of written instruments are legal questions upon which we exercise unlimited review. Accordingly, we are not bound by the lower court's interpretations of those instruments. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014). "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, Syl. ¶ 3, 298 P.3d 250 (2013). "A cardinal rule in the construction of contracts is that they

must be interpreted in light of their own peculiar provisions, and every provision must be construed, if possible, so as to be consistent with every other provision and to give effect to all." *Wiles v. Wiles*, 202 Kan. 613, 619, 452 P.2d 271 (1969).

"'"An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided."' [Citations omitted.]" *Waste Connections*, 296 Kan. at 963.

"When a writing is incorporated by reference, it becomes a part of the contract only so far as to effectuate the specific purpose intended." *Kincaid v. Dess*, 48 Kan. App. 2d 640, 650, 298 P.3d 358, *rev. denied* 297 Kan. 1246 (2013).

For ease of reference and clarity, we restate the offset provision of the financing agreement contained in Paragraph 4(a):

"4.     Equity Participation Rights:

(a)  Assets Subject to Participation. The holder of the Equity Participation (the 'Equity Participant') shall be entitled to 11% of a sum (hereinafter referred to as the 'Sale Balance' or 'Refinancing Balance' as the context requires) equal to the gross proceeds of a Sale or Refinancing (as defined in Paragraph 5 hereof) of the IRB Project net of the following items:

(i)  all direct costs of such Sale or Refinancing;

(ii)  any amounts paid to discharge the principal of the IRB if same is to be discharged in connection with such Sale or Refinancing;

(iii)  any amounts paid to discharge the principal of the Loan if same is to be discharged in connection with such Sale or Refinancing;

18

(iv) any amounts paid to discharge the principal of any other loan which may be made for Capital Expenditures (as hereinafter defined) made in connection with the IRB Project or acquisition thereof by LCBA or any of its Affiliates, excluding any loan made for operating expenses and any loan described by clause (v) below; and

(v) the principal amount of capital contributed or loaned to LCBA by [The Law Company] or any of its Affiliates for Capital Expenditures made in connection with the IRB Project or acquisition thereof by LCBA or any of its Affiliates, returned without interest, but excluding any equity invested or loans made for operating expenses."

The financing agreement states that "[t]he Sale Balance of any Sale shall be that portion of the gross proceeds of such Sale as is described in Paragraph 4(a)."

C.  *The district court erred in determining that all of The Law Company's loans to LCBA to discharge principal of the promissory note and IRB qualified for an offset.*

There are three specific disputes between the parties concerning what are proper offsets under Paragraph 4(a)(v):  (1) whether The Law Company's loan to LCBA to pay the principal of Margaret's promissory note qualifies as a capital expenditure and thus an offset; (2) whether the parties intended a separate offset for The Law Company's loan to LCBA to pay off the IRB principal; and (3) whether the Plaintiffs were entitled to a total capital expenditure offset of $1,901,853 on summary judgment. We initially address the parties' first two disputes.

Paragraph 4(a)(v) allows an offset against Margaret's equity participation share "the principal amount of capital contributed or loaned to LCBA by [The Law Company] for Capital Expenditures made in connection with the IRB project or acquisition thereof by LCBA." Paragraph 5(b) of the financing agreement defines a Capital Expenditure as

19

"any 'Construction Cost,' as that term is defined by Section 4.7 of the IRB Lease, which is paid by LCBA or by any of its Affiliates, exclusive of builder's overhead or profit if payable to [The Law Company] or to any of its Affiliates, and exclusive of tenant improvements which are not financed by the IRB. Further, in no event shall any legal expenses incurred by LCBA or any of its Affiliates on its behalf in connection with preparation or performance of this Agreement be deemed a Capital Expenditure."

From the above language, the financing agreement incorporates by reference the term Construction Cost from Section 4.7 of the IRB Lease to supply the meaning of a capital expenditure. Under the financing agreement, which in turn references the IRB Lease:

"The term 'Construction Cost' shall be construed to include all of the following costs and expenses paid or incurred subsequent to August 12, 1980: (i) all costs and expenses necessary or incident to the acquisition of the Land and such of the Improvements as are constructed, installed or in progress at the date of such acquisition; (ii) all costs and expenses of every nature incurred in *constructing, purchasing and/or installing the Improvements and completing the Project*, including the machinery and equipment constituting a part of same and referred to in Section 4.5 hereof, including interest paid or to be paid by Tenant during construction; (iii) any and all expenses incurred by Landlord or Tenant, including those prior to the sale of the Bond, for planning, development and design, and all expenses for architects' and engineering fees; the fees and expenses of Tenant's employees and consultants, surveys, attorneys' fees, and other items necessary to the commencement of construction, including advances to contractors and others by Tenant; (iv) *all other expenses necessary or incident to the construction and completion of the Project*; and (v) any and all expenses of whatever nature incurred in connection with the issuance and sale of the Bond, including but not limited to underwriting expenses incurred subsequent to August 12, 1980 and which qualify as expenditures paid or incurred in accordance with Section 103(b) of the Code and Treasury Regulations promulgated pursuant thereto. Landlord hereby agrees to pay for, but solely from the Construction Fund, and hereby authorizes and directs the Fiscal Agent to pay for, but solely from the Construction Fund all Construction Costs, upon receipt by the Fiscal Agent of a certificate of the Project Manager, requesting a specified sum of money, and

20

describing in reasonable detail the Construction Costs which forms the basis for said request, as provided by Sections 4.4 and 4.5 hereof.

"*Within three (3) months following the end of the Tenant's fiscal year in which construction of the Project is completed, Tenant shall file a verified statement of its final cost, certified by Fox & Company, independent Certified Public Accountants, with appropriate detail showing the cost of elements of construction, which statement may be part of Tenant's annual financial statement for such year*. The Tenant shall make available to the Fiscal Agent and Landlord upon request, its receipted invoices for labor and material covering all Improvements; any furniture, fixtures and equipment which become part of the Improvements; and architects' and engineers' fees, and any other Construction Costs hereunder. The Fiscal Agent may rely fully on any such direction and shall not be required to make any investigation in connection therewith, except that the Fiscal Agent shall investigate requests for reimbursement directly to Tenant and shall require such supporting evidence as would be required by a reasonable and prudent trustee." (Emphases added.)

Reading the term "construction cost" along with Paragraphs 4(a) and 5(b) of the financing agreement, the parties defined a capital expenditure as a construction cost consisting of "all costs and expenses of every nature incurred in constructing, purchasing and/or installing the Improvements and completing the Project, including the machinery and equipment constituting a part of same and referred to in Section 4.5 hereof, including interest paid or to be paid by Tenant during construction." But "construction cost" contains two exclusions, the second of which will become important later. It excludes builder overhead, profit, and legal expenses, and it excludes "tenant improvements which are not financed by the IRB."

Given the use of broad language to define the term construction cost in the IRB Lease, which in turn defines the term capital expenditure in the financing agreement, it is apparent that any capital expenditure offset under Paragraphs 4(a) and 5(b) has a broad meaning—but also an end point. That end point, according to Section 4.7(iv) of the IRB

21

Lease, is the "completion of the Project," which we understand to mean the completion of the construction of the Riverview Building. Supporting our interpretation is the fact that the second complete paragraph of Section 4.7 of the IRB Lease, which defines the term construction cost, requires the Project Manager to file a certified final construction cost statement when construction ends.

But Paragraph 4(a)(v) of the financing agreement also allows for an offset for any capital contributed or loaned to LCBA by The Law Company for capital expenditures "made in connection with the IRB Project or acquisition thereof by LCBA." The Plaintiffs take the position that the phrase "acquisition thereof by LCBA" should be broadly interpreted to mean LCBA's free and clear ownership of the Riverview Building. They contend that capital loaned by The Law Company to LCBA to allow it to satisfy both the promissory note (the promissory note was secured by a mortgage on the Riverview Building) and the IRB principal, thus giving LCBA free and clear title to the Riverview Building, should be offset against Margaret's equity participation amount. The district court agreed with this position.

Margaret argues on appeal that the district court unreasonably interpreted the meaning of "acquisition thereof by LCBA" as meaning acquisition of fee title to the Riverview Building. Instead, Margaret argues "acquisition" should mean "[t]he gaining of possession or control over something; . . . [s]omething acquired." Black's Law Dictionary 28 (10th ed. 2014). According to Margaret, the parties only intended for the offset under Paragraph 4(a)(v) to include The Law Company's loans to LCBA before LCBA gained possession of the Riverview Building as a leasehold estate. She also points out that Paragraph 4(a)(v) does not directly state an offset applies for any loan or capital contributed by The Law Company to LCBA to pay "rent" or to pay the IRBs. We agree.

The financing agreement does not incorporate by reference the term "Basic Rent" under Section 2.1 of the Lease. While it is true that the district court found it

22

uncontroverted that "Basic Rent" under 2.1 of the Lease consisted of the "amounts necessary to pay (i) the principal of, and interest on, the [IRBs]," The Law Company's loans to LCBA can only qualify as a capital expenditure or construction cost for "other expenses necessary or incident to . . . completion of the Project." As we have already determined, completion of the project means completion of construction of the Riverview Building.

Margaret also contends that the district court's interpretation of Paragraph 4(a)(v) violates the last antecedent rule. The last antecedent rule generally states "'that "qualifying words are 'ordinarily confined to the last antecedent, or to the words and phrases immediately preceding.'"'" *Lozano v. Alvarez*, 306 Kan. 421, 426, 394 P.3d 862 (2017). Kansas courts have generally recognized the last antecedent rule as a tool for construing ambiguous statutes that requires flexible application. See *State v. Kleypas*, 272 Kan. 894, 950, 40 P.3d 139 (2001) (no application if language plain and unambiguous), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); *Link, Inc. v. City of Hays*, 266 Kan. 648, 654, 972 P.2d 753 (1999) (flexible application). But see *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 330, 255 P.3d 1186 (2011) (Leben, J., concurring) (reasoning courts can apply linguistic canons, such as last antecedent rule, even if statutory language clear because canons "simply reflect common understandings about how our language is used and often provide useful clues to intended meaning").

According to Margaret, the grammar and context of Paragraph 4(a)(v) do not support an offset for The Law Company's loans or capital contributed to LCBA for acquisition of the Project as defined by the Plaintiffs because the last antecedent phrase before "acquisition thereof by LCBA" in Paragraph 4(a)(v) is "Capital Expenditures made in connection with." So, the offset can only apply to The Law Company's loans to

LCBA for "Capital Expenditures" or construction costs "in connection with the . . . acquisition [of the Project] by LCBA." Again, we agree.

In our view, both the clear language of Paragraph 4(a)(v) and application of the last antecedent rule supports a finding that Paragraph 4(a)(v) intended to allow an offset only for the principal amount loaned to LCBA by The Law Company for LCBA's completion of construction of the Riverview Building and its possession of the Riverview Building, not for LCBA's ultimate fee title ownership.

Thus, when turning to the Plaintiffs' claim that The Law Company's loan to LCBA to allow it to pay off the promissory note should qualify as an offset, we see that Paragraph 4(a)(v) of the financing agreement does not allow such a loan to qualify. Remember that the $406,836 promissory note was entered into between Margaret and LCBA in exchange for Margaret's transfer of the Market Street Building to LCBA, which then allowed LCBA to sell it and use the proceeds to help fund the construction of the Riverview Building. LCBA ultimately deposited $400,000 into the construction fund and received an offset for this contribution. Thus, the purpose of the promissory note was not to fund capital expenditures or construction costs but to finance LCBA's acquisition of the Market Street Building. Moreover, to grant the Plaintiffs an offset for the amount of the promissory note would result in a unfair "double counting" of their contribution into the construction fund and deny Margaret fair value for her interest in the Market Street Building.

Finally, we observe giving the Plaintiffs an offset of $406,836 for the promissory note would be contrary to the provision of Paragraph 4(a)(iii) of the financing agreement. Subparagraph (iii) provides for an offset for the discharge of the principal of "the Loan" if made "in connection with such Sale." According to Paragraph 1(f) of the financing agreement, the loan referenced in this subparagraph is the promissory note. According to the promissory note's terms, and as found by the district court, this loan to LCBA had to

24

be paid off on or before December 31, 2004. As the Riverview Building was sold on July 29, 2015, LCBA's payments to Margaret under the promissory note were not made "in connection with such Sale" of the Riverview Building. Thus, Plaintiffs' discharge of the principal amount of the promissory note is not entitled to be offset against Margaret's equity participation share.

The Law Company's loans to LCBA to fund its payments of the IRB principal are also not entitled to be offset for similar reasons. In our view, both the clear language of subparagraph (v) and application of the last antecedent rule support a finding that Paragraph 4(a)(v) intended to allow an offset for the principal amount loaned to LCBA by The Law Company for LCBA's construction and possession of the Riverview Building, not for LCBA's ultimate fee title ownership. In reviewing the entire financing agreement with Paragraph 4(a)(v), the parties intended that the IRB Lease allowed LCBA to acquire "said building and the parcel on which it is located under the terms stated therein."

Additionally, if we were to accept the Plaintiffs' interpretation, it would render meaningless the provisions of Paragraph 4(a)(ii) of the financing agreement. Subparagraph (ii) allows an offset for amounts paid to discharge the principal of the IRB, but only if made "in connection with" the sale of the Riverview Building. The principal sum of the IRB was $4.2 million, and it is undisputed this principal was paid in full. However, according to the IRB Lease, the maturity date for the IRB was March 1, 2002, suggesting the principal amount of the IRB would have been paid off on or before the sale date because the Riverview Building was not sold until July 29, 2015, meaning such amounts paid would not have been in connection with the sale of the Riverview Building. We question why such a subparagraph would be needed if the Plaintiffs could simply offset their IRB principal payments as capital expenditures or construction costs under subparagraph (v). Therefore, the Plaintiffs are not entitled to an offset for loans made by The Law Company to LCBA for payments made to discharge the IRB principal.

The district court erred in concluding that The Law Company's loans to LCBA for payments toward the promissory note and the IRB principal qualified as a Paragraph 4(a)(v) offset.

D.      *The district court erred in granting summary judgment for the Plaintiffs in the full amount of principal The Law Company loaned to LCBA for capital expenditures.*

The final dispute over the proper offsets contained in Paragraph (4)(a)(v) of the financing agreement concern loans made by The Law Company to LCBA for capital expenditures, principally tenant improvements or tenant finishes. As we have previously noted, one of the specific exclusions to capital expenditures or construction costs is "tenant improvements which are not financed by the IRB." Of particular interest is the fact that the district court relied on evidence outside of the contract to construe the parties' intended meaning for "tenant improvements which are not financed by the IRB." On appeal, neither party argues that we can ascertain their intent for excluding "tenant improvements which are not financed by the IRB" from the meaning of a capital expenditure by reviewing the four corners of the financing agreement. In addition, neither party argued below nor did the district court find the financing agreement was ambiguous or unclear in defining a capital expenditure or tenant improvement.

"The question of whether the language in a written contract is ambiguous is one of law for the court. And the parties' agreement or lack of agreement on the existence of ambiguity does not compel the court to arrive at the same conclusion." *Waste Connections*, 296 Kan. at 964. "'[A] contract is "ambiguous" only when the words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings.' A contract must be construed within its four corners and all provisions considered together, not in isolation." *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1206, 308 P.3d 1238 (2013).

26

While extrinsic or parol evidence is inadmissible to contradict, alter, or vary the terms of a written instrument, "it is admissible to aid in the construction of a silent or ambiguous contract." 297 Kan. at 1206. "The purpose of the parol evidence rule is to prohibit evidence of *prior* or *contemporaneous* agreements from being used to define, interpret, or contradict unambiguous terms of a written contract." *Cude v. Tubular & Equipment Services*, 53 Kan. App. 2d 287, 291, 388 P.3d 170 (2016). Black's Law Dictionary 675 (10th ed. 2014) defines extrinsic evidence as:  "Evidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement. • Extrinsic evidence is usu. not admissible to contradict or add to the terms of an unambiguous document."

Our Supreme Court has explained that if an agreement is ambiguous, then the

"'facts and circumstances existing prior to and contemporaneously with its execution are competent to clarify the intent and purpose of the contract in that regard, but not for the purpose of varying and nullifying its clear and positive provisions.' We have also looked at the parties' subsequent conduct where their actions manifested a mutual understanding of the contract's meaning. [Citations omitted.]" *Central Natural Resources v. Davis Operating Co.*, 288 Kan. 234, 245, 201 P.3d 680 (2009).

As we have already briefly outlined, Paragraph 4(a)(v) of the financing agreement allows an offset to Margaret's 11% equity participation share for "the principal amount of capital contributed or loaned to LCBA by law or any of its Affiliates for Capital Expenditures made in connection with the IRB Project or acquisition thereof by LCBA." Paragraph 5(b) lists two exclusions to the capital expenditure term, but the parties only dispute the interpretation and effect of the second. The disputed portion of Paragraph 5(b) states: "A Capital Expenditure is any 'Construction Cost,' as that term is defined by Section 4.7 of the IRB Lease, which is paid by LCBA . . . exclusive of tenant improvements which are not financed by the IRB."

27

The financing agreement does not define the terms "tenant improvements" separately or together. A review of the entire financing agreement, however, reveals the parties' intent behind using the terms "not financed by the IRB."

"WHEREAS, LCBA has commenced construction of said new office building, which construction is being undertaken by LCBA as an agent of the City of Wichita pursuant to the instruments and documents executed in connection *with the issuance by the City of Wichita of its industrial revenue bond (the 'IRB'), the proceeds of which IRB were used to finance the City's acquisition of the site of said office building and are being used to finance a portion of the construction cost thereof* . . . ." (Emphasis added.)

Read with Paragraph 5(b), the financing agreement shows that the parties intended to exclude from the meaning of a capital expenditure any "tenant improvements" not financed by the proceeds of the City of Wichita's IRB. Thus, under Paragraph 4(a)(v), any capital contributed or loaned to LCBA by The Law Company for construction costs could be subject to the exclusion because the funds were not financed by the IRB.

Moreover, Paragraph 5(b) also requires that LCBA use a capital expenditure or construction cost "not financed by the IRB" for "tenant improvements." The intended meaning of "tenant improvements" presents the main issue on appeal. Paragraph 5(b) incorporates by reference the term "Construction Costs" from Section 4.7 of the Lease. In her reply brief, Margaret argues we should find the financing agreement also incorporated the Lease's term for "Improvements." But Margaret's argument lacks merit.

The financing agreement does not expressly incorporate the term "Improvements" from the Lease. Generally,

"[f]or an incorporation by reference to be effective, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms. A reference to another document must be clear and unequivocal, and the terms of the incorporated

28

document must be known or easily available to the parties. A document is considered incorporated by reference where the incorporating document specifically provides that it is subject to the incorporated one. However, a mere reference to another document is not sufficient to incorporate that other document into a contract; the writing to which reference is made must be described in such terms that its identity may be ascertained beyond reasonable doubt.

"Other writings incorporated by reference as a part of a written contract may properly be considered in the construction of the contract. Where a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is incorporated, is to be interpreted as part of the writing; the two writings should be construed together." 17A C.J.S., Contracts § 402.

As stated above, "[w]hen a writing is incorporated by reference, it becomes a part of the contract only so far as to effectuate the specific purpose intended." *Kincaid*, 48 Kan. App. 2d at 650. We find Paragraph 5(b) does not incorporate by reference the term "Improvements" from the Lease as the meaning of tenant improvements.

Kansas courts do not necessarily require an express incorporation by reference and read multiple agreements together if executed at the same time, between the same parties, and in connection with the same transaction. See, e.g., *Rail Logistics, L.C. v. Cold Train, L.L.C.*, 54 Kan. App. 2d 98, 108-09, 397 P.3d 1213 (2017); *Fleetwood Enterprises v. Coleman Co.*, 37 Kan. App. 2d 850, 858, 161 P.3d 765 (2007). But the two instruments here do not meet the requirements. The Lease was executed between the City of Wichita and LCBA on March 1, 1982. The financing agreement was executed between Margaret and The Law Company and LCBA on January 12, 1984. Absent an express incorporation by reference of the term "Improvements" from the Lease into the financing agreement, we find the parties did not intend the term "tenant improvements" to have the same meaning as "Improvements."

29

A review of the four corners of the financing agreement does not clearly determine what the parties intended the term "tenant improvements" to mean. It appears the parties intended tenant improvements to have a different meaning than construction costs, while also qualifying as a construction cost. But the financing agreement appears to modify the term improvements with the term tenant, but the parties' intent in using the terms together cannot be clearly ascertained from its four corners. The parties argued below that the financing agreement did not define the term "tenant improvements" and presented two reasonable interpretations of the financing agreement. The parties to the financing agreement may have intended the term to apply to construction costs specific to a tenant space and not financed by the IRBs. Or, the parties may have intended tenant improvements not to apply to original construction costs to a tenant space but to specific, tenant-requested improvements not financed with the IRBs. Thus, we cannot clearly ascertain the parties' intended meaning for excluding from a capital expenditure "tenant improvements which are not financed by the IRB." That makes this provision of the financing agreement ambiguous.

Our Supreme Court has held: "A written contract is amenable to interpretation as a matter of law by the court. But, if the language of a contract is ambiguous and the intent of the parties cannot be ascertained from undisputed extrinsic or parol evidence, summary declaratory judgment is inappropriate." *Waste Connections*, 296 Kan. at 963-64. Here, the parties rely on no prior or contemporaneous agreements to support their interpretation of the intended meaning for "tenant improvements" in the financing agreement but, instead, resort to documents and expert explanations for interpreting the term after the parties executed the financing agreement.

In summary, Margaret argues the exclusion applies to all "tenant finishes"—as designated in the LCBA's construction payment records—paid from The Law Company's $600,000 loan to LCBA and deposited into the Special Construction Fund. The Plaintiffs argue the term "tenant improvements" should not apply to payments for original costs

30

needed to complete construction on the individual tenant spaces but applies to customized, tenant-requested improvements.

Margaret specifically argues all the "tenant finishes" listed in The Law Company's directors meeting reports, paid for from the Special Construction Fund, i.e., The Law Company's $600,000 loan to LCBA after the IRB proceeds were exhausted, are excluded from the Paragraph 4(a)(v) capital expenditure loan offset as "tenant improvements which are not financed by the IRB." According to Margaret, the parties intended that all improvements to tenant-specific spaces not financed by the IRBs be excluded from capital expenditures and, thus, not be subject to offset under Paragraph 4(a)(v).

Relying on real estate definitions, the Plaintiffs argue the parties intended to apply a different meaning for "tenant improvements" than the term "tenant finishes," as used in the Project's construction payment records and directors meeting notes. Specifically, the Plaintiffs argue the parties did not intend to exclude as a tenant improvement costs necessary to complete construction and bring the original tenant spaces into usable offices, such as the HVAC, electrical, and the building telephone system. From a review of the payment orders, the Plaintiffs' claim appears questionable because the construction payment orders designate different payments for "Painting," "HVAC and plumbing," "Electrical," and "Tenant finishes." But the Plaintiffs also argue that Porter stated he considered tenant improvements as meaning improvements to tenant spaces *after* "basic construction completion," which he did not include as a capital expenditure offset in his calculation of Margaret's equity participation share of $1,902,236.

In addition, the Plaintiffs now argue on appeal that the parties intended the term "tenant improvements" to have the same meaning as the real estate definition—originally relied on by Margaret below and rejected by the district court—as

31

"The real estate definition of Leasehold improvements, also known as tenant improvements (TI), are the customized alterations a building owner makes to rental space as part of a lease agreement, in order to configure the space for the needs of the particular tenant. There include changes to walls, floors, ceilings, and lighting among others." Certified Commercial Investment Member Institute, https://www.ccim.com/sites/default/files/tenantimprovements.pdf (last visited Feb. 6, 2019).

Addressing the Plaintiffs' trade or usage arguments first, Kansas courts generally require parties to meet certain requirements in order to use trade usage and custom terms to interpret an ambiguous term in a contract.

"'The proper office of trade usage or custom is to explain technical terms in contracts to which peculiar meanings attach; to make certain that which is indefinite, ambiguous or obscure; to supply necessary matters upon which the contract itself is silent; and generally to elucidate the intention of the parties when the meaning of the contract cannot be clearly ascertained from the language employed. [Citations omitted.]' *Branner v. Crooks*, 6 Kan. App. 2d 813, 815, 635 P.2d 1265 (1981).

"Nevertheless, our Supreme Court has made clear that when one party seeks to establish trade custom and usage, it must be shown that the other party knew of the custom or that the knowledge among those in the business or industry was so notorious as to provide a presumption that the other party knew of it. *Wendling v. Puls*, 227 Kan. 780, Syl. ¶ 4, 610 P.2d 580 (1980). Furthermore, trade custom and usage must be established with clear and convincing evidence. 227 Kan. 780, Syl. ¶ 4." *Davis v. Key Gas Corp.*, 34 Kan. App. 2d 728, 737, 124 P.3d 96 (2005), *rev. denied* 281 Kan. 1377 (2006).

The summary judgment record is devoid of any evidence that the parties to the financing agreement had knowledge of the trade usage and custom definitions when the financing agreement was executed, nor does the record show that either party established that the knowledge of those in the business or industry was so notorious as to provide a presumption that either party knew of it. More importantly, the parties disputed below

whether the district court could use the trade usage and custom definitions to ascertain the parties' intended meaning for "tenant improvements" in the financing agreement.

If the parties rely on the construction payment records and directors meeting reports as evidence of the parties' conduct after execution of the financing agreement, then the evidence does not support that the parties' "actions manifested a mutual understanding of the contract's meaning." *Central Natural Resources*, 288 Kan. at 245. Accordingly, we find the district court erred in granting summary judgment for the Plaintiffs because the language of the financing agreement is ambiguous and the intent of the parties cannot be ascertained from undisputed parol or extrinsic evidence. See *Waste Connections*, 296 Kan. at 963-64.

The district court also erred in interpreting the financing agreement to include the full amount of The Law Company's loans to LCBA for $1,901,853 as a capital expenditure offset under Paragraph 4(a)(v) because—in addition to the uncertainty in the parties' intended meaning for the "tenant improvements" exclusion—the district court's interpretation gave no effect to the terms "not financed by the IRB."

The district court's error specifically impacts the grant of summary judgment to the Plaintiffs for the full principal amounts loaned to LCBA by The Law Company for:

- Funds deposited into IRB accounts. Plaintiffs originally claimed the loans amounted to $1,025,000; but the district court ordered summary judgment for $1,000,000. It is unclear where the $25,000 was allocated.
- Telephone system capital lease for $325,970.
- Other Capital Expenditures for $144,047.

II.    IS MARGARET ENTITLED TO ATTORNEY FEES AND LATE CHARGES UNDER PARAGRAPH 4(f) OF THE FINANCING AGREEMENT?

The next two claims concern Paragraph 4(f), which states: "Late Charges. If any sum is payable on account of the Equity Participation and is not timely paid, then the costs of collection and interest (at the rate of 1.5% per month or partial month) shall be added to the overdue sum."

Margaret argues that, if her claim is successful, she should be awarded attorney fees and the district court erred in denying her late charges for the Plaintiffs' untimely payment of her equity participation.

A.    *Standard of Review*

Appellate courts have unlimited review over the interpretation of contracts and statutes. See *Prairie Land Elec. Co-op*, 299 Kan. at 366 (contracts); *Cady v. Schroll*, 298 Kan. 731, 734, 317 P.3d 90 (2014) (statutes).

B.    *Attorney Fees*

For the first time on appeal, Margaret argues that if we find that the Plaintiffs failed to timely pay her the correct equity participation share, then Paragraph 4(f) of the financing agreement allows her to collect attorney fees with the use of the term "costs of collection."

Margaret acknowledges she did not raise her claim before the district court during the summary judgment proceedings but argues that we should consider her claim because its determination would aid the district court on remand or allow entry of a final judgment if we rule in her favor. In her answer, Margaret's counterclaim specifically

34

requested attorney fees as part of the late charges owed. Margaret's motion for summary judgment, however, limited the district court's consideration to "late charges due under the Financing Agreement (at the rate of 1.5% per month, due from the date of sale until paid)." In response, the Plaintiffs argue we should not review the claim due to her failure to raise the issue below and that the prudent course is to remand to the district court. Because this issue will impact the district court's actions on remand, we choose to consider it.

"'Generally, in Kansas, absent an applicable Supreme Court rule or express contractual or statutory authority to the contrary, parties bear the cost of their own attorney fees.'" *Leiker v. Gafford*, 249 Kan. 554, 561, 819 P.2d 655 (1991); see *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 162, 298 P.3d 1120 (2013). Moreover, our Supreme Court has held, in the context of a statute authorizing the awarding of costs, that "[a]ttorney fees are not a part of costs, absent express statutory authority." *Legislative Coordinating Council v. Stanley*, 264 Kan. 690, 703, 957 P.2d 379 (1998); see also *Wolf v. Mutual Benefit Health & Accident Association*, 188 Kan. 694, 700, 366 P.2d 219 (1961) (term "costs" used in statute does not include attorney fees unless expressly authorized); *Alliance Indemnity Co. v. Kerns*, 54 Kan. App. 2d 155, 162-63, 398 P.3d 198 (2017) (costs do not include attorney fees).

In light of the general Kansas rule that does not authorize the payment of attorney fees unless expressly provided and Margaret's inability to cite to us any Kansas authority authorizing the payment of attorney fees under "costs" or "collection costs" pursuant to a contractual provision, we hold the term "costs of collection" as provided in Paragraph 4(f) of the financing agreement does not include attorney fees.

C.    *Late Charge or Prejudgment Interest*

Margaret argues the district court erred in applying K.S.A. 16-201 to find that she was not entitled to prejudgment interest on her liquidated claim under Paragraph 4(f) of the financing agreement. Instead, Margaret argues that K.S.A. 16-205(a) applies because the parties had agreed upon a late charge rate of 1.5% interest.

K.S.A. 16-201 states:

"Creditors shall be allowed to receive interest at the rate of ten percent per annum, *when no other rate of interest is agreed upon*, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; for money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from and after the end of each month, unless paid within fifteen days thereafter." (Emphasis added.)

K.S.A. 16-205(a) provides in part:  "When a rate of interest or charges is specified in any contract, that rate shall continue until full payment is made, and any judgment rendered on any such contract shall bear the same rate of interest or charges mentioned in the contract, which rate shall be specified in the judgment."

"Kansas law generally provides that prejudgment interest is allowable on liquidated claims. A claim is liquidated when both the amount due and the date due are fixed and certain or ascertainable by mathematical computation. *Miller v. Botwin*, 258 Kan. 108, 119, 899 P.2d 1004 (1995)." *Lindsey Masonry Co. v. Murray & Sons Construction Co.*, 53 Kan. App. 2d 505, 523, 390 P.3d 56 (2017).

36

The two issues on appeal are (1) whether the contracted-for late charge in Paragraph 4(f) is prejudgment interest and (2) whether Margaret's claim is liquidated. Margaret attempts but does not fully explain how the Paragraph 4(f) late charge—with the agreed-upon 1.5% interest rate—differs from prejudgment interest. As stated above, she argues the late charge is not prejudgment interest, so K.S.A. 16-205 applies, not K.S.A. 16-201.

Margaret is likely correct that K.S.A. 16-205(a) applies. Our Supreme Court recognized that "when the parties do agree upon an interest rate, then that rate generally applies both prejudgment and postjudgment until payment is made in full. See K.S.A. 16-205(a)." *ARY Jewelers v. Krigel*, 277 Kan. 464, 475, 85 P.3d 1151 (2004).

Margaret also suggests that Paragraph 4(f) simply provides for "stipulated damages" in the form of "a fixed percentage late charge" rather than prejudgment interest. We are not persuaded, however, that the late charge provision in the financing agreement really serves as something other than a way to award prejudgment interest. By saying that the provision is for "stipulated damages," Margaret suggests that it is a liquidated damages provision. But that is appropriate when damages are difficult to calculate, see *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 754-55, 207 P.3d 231 (2009); 24 Williston on Contracts § 65:1 (4th ed. 2018), a situation not present here. Paragraph 4(f) can only be applied once a sum due has been calculated, and then its function is the same as if it had said that prejudgment interest of 18% per year shall be awarded on unpaid amounts.

Margaret cites to *Jones v. Kansas Gas & Electric Co.*, 222 Kan. 390, 565 P.2d 597 (1977), to argue Paragraph 4(f) should not be interpreted as prejudgment interest but represents a stipulated damage for a fixed-percentage late charge for damages for the Plaintiffs' breach of contract. Although not cited in her brief, Margaret may be relying on *Jones* for its reference to several out-of-state electric utility cases that held "late payment

charges are not interest." 222 Kan. at 397. But Margaret does not explain how her breach of contract claim relates to the regulation of public utility late charges and the *Jones* court's review of the reasonableness of a public utility's late charges. Also, the *Jones* court reviewed the above issues with the amount of the late charges and unpaid utility bills factually determined. Thus, *Jones* offers little support for Margaret's claim that the contracted-for late charges under Paragraph 4(f) are not prejudgment interest.

We also find persuasive the panel's decision in *J. Walters Constr. Co. v. Greystone South Partnership*, 15 Kan. App. 2d 689, 817 P.2d 201 (1991), where the parties contested an award for a contracted-to late charge and required the award to be based on liquidated damages. The panel first recognized the liquidated damages distinction and held: "'Interest is an inappropriate remedy when the claim is unliquidated. Interest is an appropriate remedy when claims are liquidated although subject to setoff or counterclaims. [Citations omitted.]" 15 Kan. App. 2d 697-98. After reviewing K.S.A. 16-201 and K.S.A. 16-205, the panel held that because the claims *were liquidated* and the parties had sought interest in cross- or counterclaims, the trial court did not err in awarding the lienholders prejudgment interest. 15 Kan. App. 2d at 700.

Margaret also appears to concede in her reply brief that Paragraph 4(f) is a liquidated damages provision:  "'The proper course' is to enforce liquidated damages provisions 'according to their plain meaning and not to undertake to be wiser than the parties.' *Guerin v. Stacy*, 175 Mass. 595, 597, 56 N.E. 892 (1900) (Holmes, C.J.)." Margaret argues that her claim is liquidated because calculating the amount of her equity participation "is simply a mathematical exercise." But the amounts subject to the mathematical exercise and the total amount payable for her equity participation share remain disputed.

A district court does not err in denying prejudgment interest when the amount owed under a contract is contested, meaning the amount of damages was not liquidated

38

until the district court or jury resolved the dispute. See *Wichita Fed'l Savings & Loan Ass'n v. Black*, 245 Kan. 523, 544-45, 781 P.2d 707 (1989); *Arrowhead Constr. Co. v. Essex Corp.*, 233 Kan. 241, 251, 662 P.2d 1195 (1983), *disapproved of on other grounds by Wichita Sheet Metal Supply, Inc. v. Dahlstrom & Ferrell Constr. Co.*, 246 Kan. 557, 792 P.2d 1043 (1990); *Lee Builders, Inc. v. Farm Bureau Mutual Ins. Co.*, 33 Kan. App. 2d 504, 516, 104 P.3d 997 (2005), *aff'd* 281 Kan. 844, 137 P.3d 486 (2006).

Because the financing agreement's "sum . . . payable on account of the Equity Participation" under the contract is still disputed despite our resolution of some of the issues, the district court did not err in finding it could not award prejudgment interest under the financing agreement.

III.    CONCLUSION

In conclusion, we hold the district court erred in holding that the Plaintiffs were entitled to offsets under Paragraph 4(a)(v) of the financing agreement for amounts lent by The Law Company to LCBA to discharge the principal of the promissory note and the IRB as they do not qualify as offsets. Accordingly, the district court should have granted summary judgment to Margaret on these issues. We also hold that Paragraph 5(b) of the financing agreement, which defines the term capital expenditure, is ambiguous as to the meaning of "tenant improvements which are not financed by the IRB." Because there is not uncontroverted parol evidence defining this term, the district court erred in granting summary judgment to the Plaintiffs for their claim that they were entitled to an offset of $1,901,853 as a capital expenditure offset. Finally, we hold that Margaret is not entitled to attorney fees under the "cost of collection" provision contained in Paragraph 4(f) of the financing agreement, nor is she entitled to prejudgment interest as the sum payable to her for her equity participation remains under dispute.

Affirmed in part, reversed in part, and remanded with directions.